May I begin, Your Honor? Yes. Your Honor. You're ready to go, so yes. Tony Faramudi on behalf of Mr. Kelsie Palmer, Your Honor. I think there is very little question, if any, that there was, in fact, a constitutional violation here as a district court found. The constitutional violation being that the co-defendant Eric Allen's statements were admitted, and even though they didn't actually name Mr. Palmer, they implicated him and the other co-defendant Childers. I don't think there's any question about that. If the court has any questions about that, I'd be happy to answer them. But I'm going to go ahead and go to the prejudice inquiry here, which is, I think, the real claim here, Your Honor. If you can tell me what case that you can point to where either this circuit or the Supreme Court has found references like those in this case, that they, too, they, them, showed the existence of the other defendant and therefore violated proof. Yes, Your Honor. There are so many cases that I cited, frankly, in the opening brief, which basically there are many cases who hold that if you indicate the number of the defendants, just the number, the mere number of the defendants, and I would let the court know about those, and there being three defendants in this case and Mr. Allen saying that there were three people in the car, not only Mr. Allen, Your Honor, but the detectives interviewing Mr. Allen saying that there are three people in the car. And then in addition to that, Your Honor, you have this testimony coming in before Mr. Allen's incriminating statements are admitted, where there's this issue about a curfew, Mr. Allen being cited for curfew two years prior in August 2007, and then the detective showing a picture, which is what the district court looked at or inferred from the interview itself, that they're showing a picture of Mr. Palmer pointing to him and saying, this is one of the guys that you were cited with for a violation. So that's helpful a little bit to me in terms of I'm trying to figure out what happened. What was redacted? Because it looks like there was testimony. So was it done beforehand where the officer was told you can't refer to certain things, or was there a physical redacted transcript that was given to the jury? I thought that's what I read, that there was some redacted transcript. There was some redaction, Your Honor. I can't figure out what was redacted. Was there blank spots? Did you guys go in and put they instead of they? No, Your Honor. What was redacted initially, what the prosecutor did was tell the court that I'm not going to use any of this statement. Then at the eve of trial, as Your Honor knows, brought this statement, redacted it, but in fact had Mr. Palmer's name in it still. Still had Mr. Palmer's name in it. But what was it? When you say had it, what was it, the transcript of the interview between the officer and Mr. Allen? Yes, Your Honor. The interview between the two detectives and Mr. Allen, who at the time was 16 years old, being interrogated by two detectives, and that whole transcript initially had some redaction done by the prosecutor, but we don't know what the entire transcript looked like. But what we do know is that the transcript that he proffered to the court still had Mr. Palmer's name in it. And then the court said, well, once you take out the name, Palmer's name out there, and they had some references to Mr. Tate, which is this other party involved here, who other people have picked him out as being in fact the front passenger or the backseat passenger. So there was no blackout deletions. They just went back and changed, pulled out Mr. Palmer's name. Yes, Your Honor. And put in? Well, that's unclear, Your Honor. What we do know is that the transcript itself doesn't have any noticeable deletions, like Mr. Palmer's name being taken out. But, Your Honor, I mean, there's references to we, they, there's references to you three being in the car, and there's three defendants sitting at the counsel's table. I don't think there's any question here, Your Honor, there was a violation whatsoever. Counsel, could I interject a question? Yes, Your Honor. I think, it seems to me you've got a very good argument that there's a confrontation clause violation if the redacted transcript was likely to be understood by the jury to be referring to your client. What bothers me in this case is a different issue, issue of harmless error, because I understood that the state court also said if there was a confrontation error, it was harmless, that they made a specific decision on that, which under ADPA, I think I would have to conclude not just that's wrong, but it's objectively unreasonable. And then I ask myself, well, what's wrong with the conclusion any error was harmless? If there are two witnesses that identified Mr. Palmer, if there was evidence of a shirt in his apartment that was like a color, like indicated by witnesses, that someone in the car was wearing, and if he's a gang member and buddies with these guys, and the gang does do violent things like this for turf purposes, so what makes the error, assuming an error, harmless or not harmless? Yes, Your Honor, I completely understand Your Honor's dilemma here, but I want to make sure that the record is clear here. I know that the state court of appeal made some findings, including that two witnesses had identified Mr. Palmer. Well, let's look at those witnesses, Your Honor. One was Ms. Love, Yvonne Love. Now, we know Ms. Love was not even involved in the shooting incident, correct? She was sometime before the shooting incident. Ms. Love did not identify Mr. Palmer before trial. What she did was she looked at the six-pack photo, and she said there's three people here who look similar, including Mr. Palmer, that look similar to the person who was sitting at the front passenger. She also said, and then what happened was, Your Honor, they did a live lineup, but what they didn't do is that the police did not put the two other people that she had picked from the photographic six-pack into that live lineup. So she saw Mr. Palmer not only in the photograph but also in the live lineup without the other fillers being there. And then she comes in and testifies about the shirt. Now, keep in mind, Your Honor, that when she calls 911 and she's later interviewed by the police, she's very clear about this, that the sweatshirt did not belong to Mr. Palmer. It in fact belonged to Mr. Childress, and she was very adamant about that, Your Honor, because she actually, Mr. Childress was the last guy that she saw because he's the last person who got out of the car and said, Bullets have no name on it. Mr. Farmani? Yes, Your Honor. I don't disagree with you that Ms. Love was a problematic witness. Yes, Your Honor. She was also very difficult on the stand. I think the evidence of that is clear. Yes, Your Honor. The testimony reveals that. What about the other two witnesses, Meralda and Thomas? Yes, Your Honor. I think they're a bigger problem for you. Well, not necessarily, Your Honor. Let me just address Meralda here. Mr. Meralda, again, he did not identify Mr. Palmer. He was shown a six-pack photo. What he said was that he looked similar to Mr. Palmer. And then what happened was they bought a live lineup for him. They orchestrated a live lineup. He had plenty of time. He says it's at trial. Plenty of time to look at, observe the individuals, ask some of them to come forward and go backwards, walk around. He did not pick Mr. Palmer. He did not pick him. He picked another person who, by the way, Mr. Rodney Morris, Jr., who did not testify at trial, had also picked. That's critical, Your Honor, because if, in fact, Mr. Palmer was in that car, then he would have picked him out. But let's just for a moment say Mr. Meralda, let's just look at the circumstances that he was in at the time. I mean, this is a shooting where the car drives up. A person gets out of the car. According to Mr. Kenny Thomas, two people got out of the back seat. According to Mr. Meralda, one person. And let me just address Mr. Thomas really quick before I go any further. How old was Mr. Palmer at the time of this trial? He was, I believe, 19, Your Honor. Go ahead. I'm sorry. And what happened was, Your Honor, is that Mr. Thomas did not pick anybody. He wasn't able to pick anyone. What is important about Mr. Thomas' testimony is that he corroborates, if, in fact, we can believe Ms. Love, anything she says, he corroborates Ms. Love's testimony that there were, in fact, four people in the car. Four people in the car. Two people got out of the back seat and started shooting. That's what Kenny Thomas' testimony is very adamant about. He was questioned extensively about that. So you have one thing that I think is very important here, Your Honor, and it shouldn't really be glossed over, is that there were no fingerprints. They looked at this car inside out. There was nothing implicating Mr. Palmer. None. No physical evidence. None whatsoever. What about the cell phone evidence? The cell phone evidence, Your Honor, the, first of all, we don't know if Mr. Palmer was carrying it. We know he was a member. There's no question he was a member of a gang. We're not going to debate that, Your Honor. But we know that in that particular gang setting, there were people coming in and out of the house that he was staying in. This is a person who doesn't even have family to go to. This is a person that stays with a quasi-mother. Stays at that house where all these gang members go in and out. They had access to that phone. Nobody knows if he, in fact, had that phone. And there's testimony, Your Honor, that the phone is not like a GPS. There's also testimony, Your Honor, that he was, that the, it could have hit a tower a mile and a half to six miles. So there is, when you sit back and look at the evidence that was, in fact, against Mr. Palmer, and considering the fact there was simply no fingerprints whatsoever on him, even assuming he was in the car with Ms. Love incident, that doesn't necessarily mean he was in the car at the time of the shooting. There's nothing. I mean, I can't even say he was in the car with Ms. Love because there's no fingerprints. So you've outlined those facts, but so what is the analysis at this point? Yes, Your Honor. Double check me on this. Is this, this is Brecht, so we have to, I guess the government has the burden of showing that this statement that Mr. Allen gave that was problematic, or we're going to assume in arguendo right now that it was problematic. Yes, Your Honor. Violation of the Confrontation Clause. And so then there has to be a showing that there was a substantial and injurious effect. Yes, Your Honor. Of that statement, or that causes grave doubt. Yes, Your Honor. Is that correct? Yes, Your Honor. And so in light of that, what's your best argument? Because there's also these Delaware factors that are supposed to help guide us into whether there was harmless error. Your Honor, whether you look at this from the substantial injurious effect test or the AEDPA, which we know is subsumed by that, we again go back to the evidence, and we look at the Court of Appeals recitation of that evidence, Your Honor, and it wasn't correct. The Court of Appeals, because ultimately the court has to look to see, as Judge Gold pointed out, whether the California Court of Appeals reasoning was flawed under AEDPA. And the California Court of Appeals makes these factual determinations that are based on sufficiency of the evidence, Your Honor. The California Court of Appeals assumes that Meralda identified or was unsure. That's what they call unsure about his identification and live lineup. He wasn't unsure. He picked number one, which wasn't Mr. Palmer. That is not unsure, Your Honor. That is a wrong way of looking at the fact. The only way you can compromise or you can come to that conclusion is if you're looking at it from a sufficiency of the evidence under Jackson, which is not the test, Your Honor. So right there and there, the California Court of Appeals was objectively unreasonable under AEDPA in concluding there was no prejudice here. And all the evidence that I set forth in front of the court, there is grave doubt here, Your Honor, considering the fact that there was absolutely no physical evidence tying him. I admit the facts are bad. The facts are bad. He's not the best citizen out there. He's not a great guy. He was a gang member. But to convict him and give him life without the possibility of parole, when the prosecutor comes in and says to the court, I'm not going to use these statements, and then comes in and uses them because he knows he doesn't have any evidence against him. He knows that he's going to be in trouble. I respectfully ask, Your Honor, to reverse this case and have him have a trial where he won't be, these statements won't be admitted against him, Your Honor, because they're wrong. Thank you. I've allowed you to go over time. I'll give you a minute or two for rebuttal. I appreciate that, Your Honor. Thank you. And I'll allow Mr. Glassman the same amount of time. Good morning, Judge Merguia, Judge Gould, Judge Christensen, and may it please the Court. I would briefly like to talk about error in this case before I move to prejudice. As you pointed out, Judge Merguia, in the context of the ADPA, we are looking to see what the Supreme Court has held that would control this case. And I would ask the Court to consider two things. First, we know that in the Bruton case, the violation occurs when the defendant is directly implicated in the statement by a non-testifying co-defendant's confession. That is not what happened in this case. So this is not a violation of Bruton. So we then look to see what else the Supreme Court has held. What happened here? I mean, there was discussion that they were not going to use this statement. It seemed like that's what everybody's understanding. And then on the day or, you know, eve of trial, out comes the statement from the government deciding they were going to use it, and it still had his, apparently still had the defendant's name on it. What was going on here? And then I guess the other question is, you know, the redacted statement, I mean, when you look at our guidance given in Richardson and Gray, it seems like you're supposed to remove the reference to other defendants, not only, you know, the number, but their existence. And so when you see in the statement here that they say they to, them and they, it clearly makes a reference to other defendants' existence. And so I guess I'm just trying to figure out, you just kind of made a statement right now, how is that supported? Because, Your Honor, if we do look at the remaining Supreme Court cases in this area, specifically Richardson v. March, which you've indicated, the court makes it clear there when it describes what it means by omitting a reference to the defendant's existence. It makes it clear in footnote five that the court is expressing no opinion. That's what the court says, no opinion, or not reaching any conclusion about the use of pronouns. So it is not the case that the Supreme Court has ever held that the use of pronouns or other references to third parties violates Bruton. And the only reason, according to Gray v. Maryland, the only reason that the court finds the violation there is that it finds that the use of brackets or ellipses or other devices that so obviously identify the defendant without naming him, that's the equivalent of Bruton. That didn't happen here. To be clear, there were no brackets in this case. There was no ellipses. No one referred in any way directly to this defendant. And so... There's three defendants on trial. Go ahead. But we've clearly got an inference here, counsel, when we have... I mean, let me just give you an example. After the shooting, when Alan was dropped off at school, he referred to them two were left in the car. I mean, that points the finger, I think, pretty clearly. I think the inference is he's referring to Childress and Palmer. And I think Richardson v. Marsh, I mean, we can quibble about how far that case goes, but, I mean, if you look at the words that were used that remained in the statement, the other guys, they, them, them two, which were not redacted, under the facts of this case, it could be referring only to Palmer and Childress, I think, correct? Judge Christensen, the inference that you're talking about is an inference that one may draw from all the evidence. And I would submit that when one reads Richardson v. Marsh, the court says very specifically, that's not the test. The test is whether or not there was a direct identification of the defendant, either by name or by the ellipses. And to that point, I would add that, and I don't think I'm splitting hairs here, you know, the district court in this case says twice, well, the state court may have erred or may likely have erred. Under the ADPA, there should be an explicit acknowledgement that a holding of the Supreme Court has been violated, not that there may be brutal error because this may be analogous to the Bruton case. So that is why, but I do want to take my remaining time and focus on prejudice. Counsel, before you go on to prejudice, I have a question just to make sure I understand your legal position on confrontation there. Somewhere I got the impression, I thought from one of those Supreme Court cases, that it would be enough for a brutal error if it was likely or probable that a jury would understand the statement to be referring to the appellant. Judge Gould, I read those cases differently unless I'm forgetting some specific language that you have in mind, because, again, I think the import of those cases is that, and I think particularly Richardson v. Marsh says this, is that it is not the likelihood, rather it is whether the defendant is directly implicated in the statement, either by the use of his name or by some mechanism that is so clumsy and obviously an attempt to remove his name that he might as well be named. And that is why I think Richardson v. Marsh, certainly the majority opinion makes clear that there will be many situations. I mean, we can debate ultimately allowing this whole idea of allowing multiple parties to be identified, because by definition that's implicating other people. That's not a Bruton violation. And if it requires you to stitch together other evidence from the trial to draw that conclusion, that's not a Bruton violation either. But I would like to get to prejudice because I know that... What's the direct evidence that was presented against Palmer? Putting aside the Allen statement, putting aside this, and I don't know why it was felt necessary to introduce evidence of the Allen and Palmer curfew violation other than to get Allen and Palmer linked to each other. But what's the direct evidence that you've got in this case? You don't have any fingerprint evidence. You've got a red and gray sweatshirt that was found in Palmer's apartment, which I understand was frequented by gang members who would leave shirts and hats in that apartment. We've got this testimony of these eyewitnesses, which is all over the place. And you've got some cell phone testimony, which I think is debatable as well.  I understand, Your Honor. I think you've got a lack of direct evidence here. And first of all, direct evidence, so to speak, would not be the test. I want to first talk about the ADPA standard. Then I'll talk about the evidence in this case because it's significant in this case. The State Court of Appeal, when it engaged in a harmless error analysis, did so under the Chapman standard. That's the most rigorous standard, as the Court knows, that we use in criminal law to decide whether error is harmless. That's not the ADPA standard. And the district court had no difficulty concluding that it was harmless in light of the evidence under a much lower standard. So let me talk briefly about what happened in this case. Our evaluation of the evidence is significantly different than the one offered by Petitioner's Counsel. We have on the morning of May 9th, and I'll try not to go over, Judge McGee, I'll make it as quick as I can. Fine. I told you you'll have that extra time that I gave. I mean, I'll try not to go over the extra. So on the morning of May 8th, 2009, and, yes, was Ms. Love a complicated witness, Judge Christensen? Sure she was. And she had a lot to say. What she said repeatedly is that she was absolutely certain that this petitioner is in that car, all right? You have a statement from the trial court saying she was not credible. And the trial court is not the fact finder. True. I'm just saying, you're saying she said with absolute certainty. I just want to make sure you account for everything that was involved here at the lower court. Well, in terms of the evidence in the case, we have her, there is her identification of him. He's in the car. He's in the same car that is involved minutes later. Later, she doesn't, she has difficulty in her identification of him. The state appellate court and the district court both find that at every proceeding, she identifies him at every proceeding. At one point in time. Yes. So, and she has him in the same passenger position that he's identified in, not days later or hours later, but minutes later when he and his companions confront the other victims. Mr. Meralda, who they wound, and the 19-year-old woman, Rosa Gay, who was murdered. So, there is Love's identification of him. Now, to say, as the petitioner says, that Meralda doesn't identify, again, this is minutes later, in the same car. He's in the same position. Again, all I can rely upon is the record and the court's characterization of the record. Both the district court says that the identification is made by Meralda. He identifies him in the six-pack lineup, but he doesn't identify him in the live lineup. So, there is identification of him there, and I believe Meralda at trial as well. It seems there's identification there. I guess the question is, doesn't that, you know, in light of what we're looking at now, it sounds like you do have some people who identify him at some point in time in some manner, but then there's other times when those two people, Love and Meralda, have difficulty and either don't identify him or are inconsistent or confuse him. So, then we have the cell phone evidence, and then I believe there's, well, it seems like, and then the gray sweater. Yes, and so what we have, stated another way, is we have both of these people at various points identifying him, and we have these people, lo and behold, identifying the same garment that they say that he was wearing is found in his home. Was it shared by other gang members in his apartment? There's no evidence of that. It's a sweater that resembles the gray and white sweater that they describe him wearing. Yeah, and isn't there a question of fact as to whether or not that gray and red, there's a gray and red sweater was worn by the front seat passenger? The evidence seems to suggest Palmer was sitting in the back seat, so don't we even have some conflict in the evidence as it relates to what the sweater looked like or sweatshirt and who was wearing it? The fact that as to this point or any point, the fact that in a murder trial where there is significant cross-examination, the fact that a point is disputed does not mean that there is more than substantial evidence ultimately of these identifications. That is why the state appellate court found it harmless beyond a reasonable doubt. That is why the district court found it harmless. He's wearing a distinctive piece of clothing according to the person that sees him minutes before the murder and at the time of the murder. Is there a metaphysical possibility that it's some different piece of clothing? The jury obviously was satisfied beyond a reasonable doubt. And to say that with respect to virtually every aspect of this evidence, so morality's identification doesn't matter. Love's identification doesn't matter. It's the same car. It's minutes later. The cell phone evidence, that is not subject to the questions that one asks of an eyewitness in terms of whether or not their identification is tainted. That cell phone evidence puts him a third of a mile from this location when he's making a call at the same time or minutes later or earlier that morning at 1025. So he's within... I thought the call was received by him, I thought. He's using the phone, is my point, Judge Gould, and he's using it at a distance that is about from that market, that grocery store down the street to this courtroom. So he is within a third of a mile of this murder. And just coincidentally, two people have described him as being there, and just coincidentally, his clothing, he's wearing an article of his clothing. I think that under the... So what's the analysis? I'm asking the same question that I asked Mr. Farmani. So the analysis at this point, I think, and you tell me if I'm incorrect, but we're now at habeas and it's in front of review, but let's just assume, and I understand your arguments on the confrontation clause, but we're looking at prejudice. Yes. You've outlined now the evidence. Yes, Your Honor. In a way that I think you would like for us to look at it. Mr. Farmani's outlined it in a way he'd like for us to look at it. But is it that we have to determine whether or not Allen's testimony was central or important, and I guess whether it had a substantial and injurious effect on the outcome or the verdict? Is that correct? Or whether it causes us to have grave doubt about the verdict? Brecht versus Abraham, as the Court is aware, speaks to the substantial and injurious effect standard. The ADPA asks whether or not a state court looking at this evidence could have reasonably decided, using a much more rigorous standard than applies in this court, could have reasonably decided that it was harmless. And I think in that context, it is significant that a federal magistrate came to the same conclusion, a federal district judge came to the same conclusion of harmlessness. If we begin with the premise that the state court got Bruton wrong, leaving aside our ADPA claim there, the question is whether or not one could look at this evidence, multiple eyewitnesses, other corroborating evidence, technological evidence as well, and decide that there was a more than sufficient record that indicated there was no substantial effect from a statement that never named him. Never. Then I think a state court could very comfortably come to that conclusion. Was Allen's testimony important in your view? Vis-a-vis this point, no. It was not. I think without Allen's testimony, in light of all the arguments that have been made here regarding the facts, there's no reason to doubt the verdict. There is zero reason to doubt the verdict. And if one looks, for example, at the way Allen's testimony was used, the prosecutor in closing argument, that would be the only real indication we have of how this was communicated to the jury, never suggests that Allen is implicating the petitioner. So, yes, it would be harmless under Brecht and under the ADPA. Thank you, Your Honor. Judge Gould? Judge Gould, with one further question. Please. The fingerprint, the lack of fingerprint evidence wasn't addressed by you in this part of your argument, though it's only one piece of evidence. But I wondered, is there any expert testimony in the record from gang experts or police experts that deals with circumstances when a person might be involved in something but not leave fingerprints? There was gang, there was testimony from a gang expert in this case, Judge Gould. I don't recall at this point, I don't recall any references specifically to evidence. I would just, by the way, one last point. Petitioner also argues that in this case length of deliberations and a request for readback indicate prejudice. I think as with the absence of gang, or rather with fingerprint evidence, you know, to say that a jury took some time to decide a case and asked to review testimony, I think that just as likely indicates the jury is doing its job. But on the fingerprint evidence, if I could just follow up, it's my understanding, it's not just that they didn't find fingerprint evidence of Mr. Palmer. They found a lot of fingerprint evidence involving the co-defendants in this case. There were like 30 that were found, but they didn't find his. Is that correct? I recall that there's other fingerprint evidence. You know, I think the inference could – Let's just assume that that is correct. Is that not significant? Let me state it more declaratively. It's my recollection that the fingerprint evidence wasn't just that they didn't find any fingerprint evidence. They found, I think it was at least 30 prints of co-defendants, but they didn't find his. And it seems like that's a little bit different than not finding any fingerprint evidence at all. And I think in terms of what it says vis-à-vis his guilt, I think it's a point that can be argued to a jury. It certainly doesn't exonerate him, and we know that the car was tampered with immediately. No, it's just another factor. I'm just wondering if it should possibly be considered when we're doing this whole analysis of trying to figure out whether or not Mr. Allen's testimony had an effect if we find that it violated the confrontation clause. Palmer may have been savvier than the others about where he left his prints. We don't know. Okay. Thank you. Thank you, Your Honor. Just a couple of things, Your Honor. About the sweater, there was – they tested the sweater to see if there was any DNA evidence that would connect Palmer to it. None. None whatsoever. Love, not only in her police statement minutes after the crime, but also in her interview, also at trial, she says that Childress was wearing that sweater. Moraldo says Palmer was wearing it when they showed the sweater to him, but Moraldo also says he never saw the front passenger get out of the car. He only saw the back passenger get out of the car, which was Allen. And he turned back and ran to the house because there was a shooting. How does he have time to look at Mr. Palmer and make an identification? And he doesn't, in fact, make an identification. Anybody who's shown a photographic line-up and then he's shown a live line-up and that defendant is sitting in court, obviously they're going to pick him out. It's obvious, Your Honor. Did this car have darkened windows? I know it was dirty. It does, Your Honor. It had tinted windows. It was a dirty car. It had tinted windows. And, you know, the fact, again, this is very important, Your Honor, the fact that there was no physical evidence tying Mr. Palmer when there was physical evidence tying the two other defendants is very critical here, Your Honor. When you have all the other conflicting evidence out here about who was wearing the sweater, I mean, this is what the state had against this guy. A sweater. A sweatshirt. A telephone, which is not a GPS, and then two witnesses who are all over the place with their identification, Your Honor. Respectfully, Your Honor, without Allen's statement, the jury would have had much difficulty finding Mr. Palmer guilty. What about counsel's argument, opposing counsel's argument that Richardson v. Marsh does not require the redacting of all references to any other defendants? Well, let's look at Richardson, Your Honor. The court said the reason why there was no violation there was because, first of all, the redacted statement didn't refer to anyone, anyone's existence. Then what happened was the defendant testifies and says, I was in the backseat of the car. So she puts herself in the backseat of the car. And that's what the court relied on in denying the claim. Now, because the court reasoned, the court said, look, there was nothing in the statement, in the redacted statement that referred to the defendant. She is the one who brought that out herself. The existence, that's the important, Your Honor. It's not the fact of inference. That's the great case. It's the kind of inference that the jury is going to make. And the jury here, it's really simple, Your Honor. You've got three people sitting down at the counsel's table. You've got a statement coming out that's referring to these two, three people showing pictures of him, saying you were cited for a curfew violation. When before, not after, before that there was testimony about a curfew violation, there is no question there was a violation. And the district court counsel pointed out that was waffling about the violation. It wasn't. The district judge says it in the order adopting the report recommendation that the California Court of Appeal was wrong in concluding otherwise. And when the California Court of Appeal was wrong on the violation, it was wrong on the Chapman analysis, too, because it was result-oriented, Your Honor. It was result-oriented based on sufficiency of the evidence, which is contrary to clearly established law when you're doing a harmless error analysis. Judge Gould, do you have any other questions? No questions here. Thank you. No, thank you. Thank you both, Mr. Bonnie and Mr. Glassman, for your helpful arguments here today. I appreciate it. And I'm sorry we went a little bit longer, but I appreciate your time and your presentations. Thank you. The case of Palmer v. Davey is now submitted.
judges: Gould, Murguia, Christensen